IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MAGDALENA FIGUEROA and
SYLVIA MAGADAN,

     Plaintiffs,

v.               CIV 02-1086 KBM/LCS

UNITED STATES OF AMERICA,

     Defendant.


# **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's motions to dismiss and in limine related to Plaintiffs' claims for damages, *Docs. 55, 57,* as well as Defendant's motion to dismiss or for summary judgment related to Plaintiffs' substantive theory of recovery, *Doc. 58.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.

I have carefully reviewed all of the parties' submissions and relevant authorities. Beginning with the substantive motion first, I find that it should be denied at this juncture so that the parties will have an opportunity to respond to the issues as I have framed them before trial. I further find that the motion to dismiss Plaintiff Figueroa's claim is without merit, but that certain damages evidence should be excluded. Because this matter will proceed to the scheduled nonjury trial, I defer ruling on the *Daubert* motion related to the proposed expert witness Grace Gianforte, preferring instead to entertain those arguments at trial.

## I.  Procedural Background & Standard Of Review On Substantive Motion

On August 4, 1999, Border Patrol Agents detained Plaintiff Madgalena Figueroa

("Figueroa") and her daughter, Plaintiff Sylvia Magadan ("Sylvia"),[1] for questioning at the border

patrol station near Alamogordo, New Mexico.  Plaintiffs filed this action on August 29, 2002

alleging as their sole basis for relief that the manner in which the agents detained them constitutes

false imprisonment under the Federal Torts Claims Act ("FTCA").  *See Doc. 1,* at 4.  They are not

bringing a *Bivens* action, presumably because they filed suit after the applicable statute of

limitations expired.  *See Doc. 72* at 2.

Generally, federal courts do not have jurisdiction over claims against the United States

because it is entitled to sovereign immunity from suit.  Section 2680(h) of the FTCA, however,

waives sovereign immunity for certain intentional torts, including claims "arising out of . . . false

imprisonment [or] false arrest."  28 U.S.C. § 2680(h).  "The applicability of the intentional tort

exception is a question of subject matter jurisdiction."  *Dry v. United States*, 235 F.3d 1249, 1257

(10th Cir. 2000).

It is appropriate for me to convert the United States' motion to dismiss to summary

judgment where, as here, the issue of subject matter jurisdiction is intertwined with the merits of

the case and I have entertained matters outside of the pleadings.  *E.g., Franklin Sav. Corp. v.*

*United States,* 180 F.3d 1124, 1129 (10th Cir.), *cert. denied,* 528 U.S. 964 (1999); *see also Doc.*

*14* at 4 (United States raises affirmative defense that "Court lacks jurisdiction over the subject

matter); *Doc. 59* at 6 (United States asserts sovereign immunity is not waived because Plaintiffs

---

[1]  Because of the similarity of the mother's first name and the daughter's last name, I refer to the daughter by her first name throughout this opinion.

fail to state a claim for false imprisonment).  Accordingly, summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

## II.  Analysis of Substantive Motion

I read all of the depositions and other materials submitted by both parties in support of their positions.  In light of that comprehensive review, I note that the parties' opposing views are primarily legal arguments in which the parties take diametrically opposed positions.[2]

Plaintiffs use the terms "false arrest," "unlawful detention," and "false imprisonment" interchangeably.   Their Complaint, for example, challenges the "manner" of their "detention," that is, being placed in a cell or handcuffed to a chair during a four-hour period.  Their response to Defendant's motion characterizes their time at the station not as a "detention" but as a *de facto* arrest.  Plaintiffs' quarrel is not with the fact that the agents pulled them over and requested them to go to the station while they investigated further.  They concede that the "agents had reasonable suspicion to engage in a brief investigatory stop," *Doc. 71* at 7, and Plaintiffs in fact voluntarily accompanied the agents to the station.  Plaintiffs ask the Court to analyze their detention under Fourth Amendment principles and to find that, when Figueroa was placed in the cell and Sylvia handcuffed to the chair, they were "seized" and "*de facto* arrested," and at that point the encounter could no longer be considered consensual.  They argue that because no probable cause

---

[2]  Neither party entirely complies with this Court's local rule concerning summary judgment practice.  *See* D.N.M.LR-Civ. 56.  The United States' memorandum, for example, contains a numbered facts section but also asserts additional facts in the body of the memorandum.  *See Doc. 59,* at 1-3, 9. Plaintiffs' memorandum does not separately-number assertions of fact or specifically respond to the United States' numbered assertions.  *See Doc. 71* at 1-6.

existed at that point, Defendant is not entitled to summary judgment on its affirmative defense to the false imprisonment claim. They further maintain that Defendant agrees with them that the "agents did not have probable cause" to arrest them. *Id.* at 7; *see also id.* at 9, 12, 15.

Defendant, on the other hand, argues that because this case is not premised on a *Bivens* action, a Fourth Amendment "totality of the circumstances" analysis is entirely irrelevant, and the Court need only focus on the three elements of false imprisonment as defined by New Mexico law. *See e.g., Doc. 72* at 3. Defendant does not take issue with Plaintiffs' implicit characterization that lack of probable cause is conceded as a matter of law, although the reason why it does not is unclear. As I understand it, Defendant contends that because the agents have the authority to deter and apprehend illegal aliens and their smugglers, and because they had a reasonable suspicion that Plaintiffs were connected to the smuggled aliens, they had the lawful authority (and knew they had the lawful authority) to detain Plaintiffs for investigation.

The agents informed Plaintiffs that they were not under arrest, and no charges were filed against them arising out of the investigation. Defendant argues that whether the manner and length of detention constitutes a *de facto* arrest is entirely irrelevant to the false imprisonment inquiry. In short, Defendant's position appears to be that only the subjective belief of the agents as to their lawful authority is relevant in this FTCA action.

The parties do not address whether the elements for false imprisonment, false arrest, and unlawful detention are distinct under state law and whether all of those theories are actionable under the waiver provision of the FTCA. Moreover, the applicable governing law is unclear in some respects, and the parties have not sufficiently addressed these issues in their briefs. Based on my own research, I am of the view that neither party's legal position is entirely correct. Below

4

I set forth my impressions of what the applicable law is and where the material facts are not sufficiently developed to allow for judgement to enter at this time.  Because the parties have not had the opportunity to address the issues as I have framed them, I will give them the opportunity to do so at trial.

### A. Allegations Of Unlawful Detention Are Actionable Under The FTCA Under A False Imprisonment Theory

Under the FTCA, the United States can be sued for personal injury resulting from the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The FTCA waiver of immunity provision at issue here specifically lists both false arrest and false imprisonment, as does the New Mexico Torts Claims Act.  *See id.* § 2680(h); N.M. STAT. ANN. § 41-4-12 ("immunity granted . . . does not apply to . . . false imprisonment, false arrest").

Neither statute mentions "unlawful detention."  Because the FTCA does not specifically recognize "unlawful detention" as a tort for which immunity is waived, the Tenth Circuit has held as a matter of federal law that "unlawful detention" is not actionable as a separate cause of action from false imprisonment under the FTCA.  Rather, allegations of "unlawful detention" are subsumed in the tort of "false imprisonment."

> Section 2680(h) lists only five of the six torts alleged in Plaintiffs' complaint.  Although "false imprisonment" is listed in the statute, Plaintiffs' sixth claim – "unlawful detention" – is not.  The definition of a term used in the FTCA 'is by definition a federal question.' . . .  To determine whether "false imprisonment" is synonymous with or includes "unlawful detention," we assume that

> "Congress proceeded from an understanding of established tort definitions . . . and consequently [we] look to the 'traditional and commonly understood legal definition of the tort' arguably excluded by § 2680(h)." . . .   The cases suggest that "unlawful detention" is an element of – or simply another name for – "false imprisonment." [citing state court decisions from South Dakota, District of Columbia, Alaska, North Dakota, and Hawaii].  Plaintiffs have not identified, nor have we found, any authority for the proposition that "unlawful detention" is a separate cause of action. We hold that Plaintiffs' unlawful detention claim does not allege a cause of action distinct from false imprisonment, and that all of the FTCA claims against the United States are therefore covered by § 2680(h).

*Dry v. United States*, 235 F.3d 1249, 1257 (10th Cir. 2000) (citations omitted).

### B.   When The Person Who Confines Plaintiff Is A Law Enforcement Officer, The Elements Of The Torts Of "False Imprisonment," "False Arrest," And "Unlawful Detention," As Well As The Available Defense To Them, Are The Same

"Under New Mexico law, '[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" *Romero v. Sanchez,* 119 N.M. 690, 693, 895 P.2d 212, 215 (N.M. 1995) (quoting N.M. STAT. ANN. § 30-4-3); *see also Scull v. New Mexico,* 236 F.3d 588, 599 (10th Cir. 2000) ("To prove a claim of false imprisonment, [Plaintiff] was required to show that [the officers] intentionally confined or restrained him without his consent and . . . knew that they had no lawful authority to do so.") (citing Judge Sutin's special concurrence in *Diaz v. Lockheed Electronics,* 95 N.M. 28, 32, 618 P.3d 372, 376 (N.M. Ct. App. 1980)); *Mendoza v. K-Mart, Inc.,* 587 F.2d 1052, 1058 (10th Cir. 1978) ("One basic element of . . . a [false imprisonment] claim is that the plaintiff be confined or restrained in some unlawful way by the defendant.").  Lack of consent and unlawfulness of the detention are thus the critical elements of a false imprisonment claim.

I have not located a case that outlines the elements of a claim of false arrest under New

Mexico law.  In some states, false arrest and false imprisonment are interchangeable and require the same proof.[3]  In another case in this district, state defendants argued that "the torts of false arrest and false imprisonment appear to have been merged into the single tort of false imprisonment in New Mexico."  *Gonzales v. Dickies,* CIV 97-162 JP/LFG (*Doc. 36* at 14).  Because the plaintiff in *Gonzales* did not dispute that contention, the court accepted the proposition and analyzed the claim under false imprisonment principles.  *Id.*  Although the parties have not discussed the issue, I believe that the two torts are the same, at least where, as here, a law enforcement officer is the one who confined the plaintiff during the course of carrying out law enforcement duties.

An early New Mexico Supreme Court decision, which involved a police officer, suggests that false imprisonment and "unlawful" arrest are the same thing and, when the confinement is an arrest, the lawfulness of the detention is measured by whether probable cause exists for the arrest. *See Ulibarri v. Maestas,* 74 N.M. 516, 518-20, 395 P.2d 238, 239-40 (N.M. 1964).  A 1980 New Mexico Court of Appeals decision rejected the argument that the recognized common law defense to a false arrest claim should not be available to a claim of false imprisonment.  *See Perea v. Stout,* 94 N.M. 595, 600, 613 P.2d 1034, 1039 (N.M. Ct. App.), *cert. denied,* 449 U.S. 1035 (1980).  The defense is generally referred to as "good faith and probable cause," and it has long

---

[3]  *See e.g., Scott v. District of Columbia,* 101 F.3d 748, 753-54 (D.C. Cir. 1996) ("The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim. . . . For either type of claim, '[t]he focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails.'") (citations omitted), *cert. denied,* 520 U.S. 1231 (1997); *Lee v. City of New York,* 2002 WL 1732810 at *4 & n.3 (E.D.N.Y. 2002) (§ 1983 claim for Fourth Amendment violation based on false arrest is informed by law of the forum; the "common law elements of false arrest and false imprisonment under New York law are the same;" case involves discussion whether investigative stop evolved into arrest).

been held that the defense is available for either false arrest or false imprisonment.  *See e.g.,*
*Pierson v. Ray,* 386 U.S. 547, 555-56 (1967) (recognizing that "common law has never granted
police officers an absolute and unqualified immunity," court held that "that the defense of good
faith and probable cause, which the Court of Appeals found available to the officers in the
common-law action for false arrest and imprisonment, is also available to them in the action under
§ 1983.").  A relatively recent New Mexico Supreme Court decision recognized the defense as
applicable to both torts.  *See State v. Johnson,* 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54
(N.M. 1996) ("a common-law defense to a civil wrongful arrest or a false imprisonment suit also
requires only that the officer prove that he or she acted in good faith and with probable cause and
therefore lawfully under the circumstances."

Although I have not found a case that precisely defines the elements of an unlawful
detention claim, New Mexico cases hold that "[u]nlawful detention has similar requirements" to
false imprisonment.  *Romero,* 119 N.M. at 693, 895 P.2d at 215.  And, the New Mexico cases
discussing unlawful detention, define it as similar to false imprisonment because the common law
defense is equally applicable to a claim of unlawful detention.  *See e.g., Johnson,* 122 N.M. at
701-02, 930 P.2d at 1153-54.  I am therefore also inclined to conclude that under New Mexico
law, when the person who confines the plaintiff is a law enforcement officer, false arrest, false
imprisonment, and unlawful detention claims are analyzed under the same principles.

### C.  *The Existence Of Probable Cause For An Arrest Means That The Detention Was "Lawful," And Defendant's Probable Cause "Concession" Is Not Binding On This Court*

In *Diaz*, Judge Sutin specially concurred and specifically discussed "[w]hat is meant by the
phrase 'with knowledge that he has no lawful authority to do so?"  *Diaz*, 95 N.M. at 32, 268 P.2d

at 376.  In answer to the question he stated:

> "Lawful" means "legal, warranted or authorized by law; having the
> qualifications prescribed by law; not contrary to nor forbidden by
> the law." . . . "authority means "permission." . . . "Lawful
> authority" to do an act means permission to act in a manner that is
> not contrary to nor forbidden by law.  "No lawful authority" to do
> an act means no permission to act in a manner that is contrary to or
> forbidden by law. . . . "it is not the province of the jury to determine
> whether or not conduct is 'legal' or 'warranted or authorized by
> law'" . . . . Determination of these matters is the province of the
> Court. . . .

*Id.*  Although the New Mexico cases loosely describe the affirmative defense as "good faith and
probable cause," ***in the context of the defense,*** "probable cause" means "an honest belief on the
part of defendants, based on reasonable grounds, that plaintiffs should be detained."  *Id.*

Here, the heart of Plaintiffs' claim is that they were in essence arrested without probable
cause thereby rendering their detention ***illegal.***  Assuming a "*de facto* arrest" finding, if probable
cause existed at the time of the arrest, Plaintiffs' claim necessarily fails because they could not
meet their burden of establishing the unlawfulness element of the tort.  *See e.g., Ulibarri,* 74 N.M.
at 519-20, 395 P.2d at 420.  In that event, the Court would never reach the issue of whether
Defendant has sustained its burden on establishing the defense.  *See Diaz,* 95 N.M. at 32, 268
P.2d at 376.  The question of whether there is probable cause to support an arrest is a question
for the Court.  *See e.g., Ornelas v. United States,* 517 U.S. 690, 696-97 (1996); *Diaz,* 95 N.M.
at 376.  I therefore am not convinced that Defendant has conceded probable cause as a matter of
law, or if it has, that the concession is binding on the Court.

The relevant portion of Defendant's memorandum, for example, states that "the agents did
not develop enough articulable facts from the totality of the circumstances to place the Plaintiffs

under arrest, to move from reasonable suspicion into probable cause. . . .  In an alien smuggling

case, one of the smuggled aliens needs to identify the suspected smuggler in order to secure a

conviction, and that did not happen in this case." *Doc. 59* at 10.  Because this passage only cites

agent testimony, and because it only describes what they believed about probable cause (or the

lack thereof) and what was required for a successful conviction, I find that it does not amount to a

concession of law.

Moreover, even if the passage could be construed as a legal concession, I do not believe it

is binding on this Court.  As the United States Supreme Court recently reiterated, it has long been

held that evidence need not support a conviction to support a finding of probable cause.

"[P]robable cause . . . means less than evidence which would justify condemnation." *Maryland v.*

*Pringle,* ___ U.S. ___, 124 S. Ct. 794, 800 (2003) (internal quotations omitted; quoting *Locke v.*

*United States,* 7  Cranch 339, 348 (1813)); *see also Johnson,* 122 N.M. at 701, 930 P.2d at 1153

("'There is . . . a material distinction between that which would be required to sustain a conviction

for an offense and that which is sufficient to justify a peace officer in arresting for a supposed

commission of such offense.'") (internal citation omitted).  Probable cause "is a fluid concept,"

"incapable of precise definition or quantification," and ultimately is an objective inquiry made in

hindsight based on all of the circumstances surrounding the particular case.  *Id.*  The agents'

perceptions may be relevant, but are not binding.[4]

---

[4]     As a leading authority states:

> The police conduct should be judged in terms of what
> was done rather than what the officer involved may have
> called it at the time. . . .  *Wayne R. LaFave et al.,* 2
> CRIMINAL PROCEDURE § 3.8(b) (2d ed.1999); *see*
> *Maryland v. Macon,* 472 U.S. 463, 470-71 (1985)

### D. Constitutional Principles Are Relevant To The Elements Of False Imprisonment And To The "Good Faith" Defense

Defendant takes the position that the only relevant inquiry is what authority the agents believed they had and, as such, Fourth Amendment principles are wholly irrelevant to this inquiry. I respectfully disagree.

To establish the unlawfulness element under state law, Plaintiffs are "required to show that . . . [the agents] knew that they had no lawful authority to" detain Plaintiffs in a cell and handcuffs for questioning. *Scull*, 236 F.3d at 599. It is difficult to conceive how the "lawfulness" of a law enforcement officer's conduct, and what that officer knew to be lawful, can be wholly divorced from constitutional principles that govern what is lawful. The New Mexico Supreme Court's decision in *Romero,* for example, which holds that unlawful detention has similar requirements to false imprisonment, cites to the Court of Appeals and its own *Ryder* decision. *Romero*, 119 N.M. at 693-94, 895 P.2d at 215-216. The New Mexico Supreme Court *Ryder* opinion states that "[t]he rule of law in New Mexico on detainments is set forth in *State v. Lewis,* 80 N.M. 274, 454 P.2d 360 (Ct. App.1969)." *Ryder v. State,* 98 N.M. 316, 319, 648 P.2d 774, 777 (N.M. 1982) (decided June 22nd). *Lewis,* in turn cites *Terry* as the law governing whether a person can be

---

("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken.") (internal citation and quotation marks omitted); [*United States v. Neff,* 300 F.3d 1217, 1221 (10th Cir. 2002) ("In measuring the actions of a police officer under the Fourth Amendment, . . . we look at the objective facts, not the officer's state of mind.").

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1322 (10th Cir. 2002) (Hartz, concurring in part and dissenting in part).

detained:

> in appropriate circumstances and in an appropriate manner, a police officer may approach a person to investigate possible criminal behavior even though the officer may not have probable cause for an arrest.  To justify such an invasion of a citizen's personal security, the police officer must be able to specify facts which, together with rational inferences [therefrom], reasonably warrant the intrusion.  These facts are to be judged by an objective standard--would the facts available to the officer warrant a person of reasonable caution to believe the action taken was appropriate? *Terry v. Ohio,* 392 U.S. 1 (1968); *State v. Slicker,* 79 N.M. 677, 448 P.2d 478 (N.M. Ct. App.1968).

*Lewis,* 80 N.M. at 276, 454 P.2d at 362.  The New Mexico Court of Appeals *Ryder* decision, which was affirmed, held that Fourth Amendment principles apply to the reasonableness of a detention, regardless of whether the officer actually had authority to do what he did.  *See State v. Ryder,* 98 N.M. 453, 456, 649 P.2d 756, 759 (N.M. Ct. App. 1982) (decided January 27th) ("The constitutional focus, however, whether related to detention or search, is upon Fourth Amendment privileges and is, therefore, the same here as in the airline cases.").  Based on these New Mexico cases, I therefore reject the argument that constitutional law is  wholly irrelevant to the state law "lawful authority" question.

Furthermore, if the investigatory detention here never ripened into a *de facto* arrest, then Plaintiffs' claim fails as a matter of law.  *See infra,* § II.E.  The question of if and when a *de facto* arrest ripened is a legal issue, for which there is no bright-line rule.  Fourth amendment and other constitutional principals are relevant to that inquiry.  The inquiry again is an objective one based on balancing a number of factors including, but not limited to, whether Plaintiffs believed that they

were not free to leave and whether any such belief was reasonable.[5]  Simply because Plaintiffs

were held in a cell and handcuffs is not dispositive.  *Gallegos v. City of Colorado Springs,* 114

F.3d 1024, 1030 (10th Cir. 1997) ("At least nine courts of appeals, including this circuit, have

determined the use of 'intrusive precautionary measures' (such as handcuffs or placing a suspect

on the ground) during a *Terry* stop do not necessarily turn a lawful *Terry* stop into an arrest under

the Fourth Amendment.").  I would prefer that the parties focus on cases involving similar factual

situations and/or investigatory detentions at the border, since those decisions are the most

instructive of how general principles are applied in the unique border context.[6]

---

[5]  *See e.g., State v. Hernandez,* 122 N.M. 809, 932 P.2d 499 (N.M. Ct. App. 1996) (whether border patrol agent bringing suspect back to station for further questioning and search amounts to *de facto* arrest); *State v. Jutte,* 126 N.M. 244, 968 P.2d 334 (N.M. Ct. App.) (whether investigatory stop at a port of entry amounts to *de facto* arrest), *cert. denied,* 126 N.M. 533, 972 P.2d 352 (1998); *see also e.g., United States v. Perdue,* 8 F.3d 1455, 1463-64 (10th Cir. 1993) ("The Supreme Court has instructed that a person has been taken into police custody whenever he 'has been deprived of his freedom of action in any significant way.' . . .  The Court has also stated that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" . . .  The only relevant inquiry is 'how a reasonable man in the suspect's position would have understood his situation.' . . .  The *Berkemer* opinion indicates that a suspect can be placed in police 'custody' for purposes of *Miranda* before he has been 'arrested' in the Fourth Amendment sense."); *Peachey Depo.* at 164-65 (Supervisor Peachey expected that Plaintiffs would have been advised of *Miranda* rights for an investigative detention); *Hatheway v. Thies, et al,* CIV 00-1200 MCA/RLP (*Doc. 82);* granting summary judgment in favor of the plaintiffs on false New Mexico arrest/false imprisonment claim in case that involved an investigatory detention that impermissibly evolved in to a custodial arrest).

[6]  To illustrate but a few examples of sources:  *United States v. Bravo,* 295 F.3d 1002 (9th Cir. 2002) (handcuffing by border patrol agents does not necessarily transform a stop into an arrest), *cert. denied,* 123 S. Ct. 1775 (2003); *United States v. Garcia,* 179 F.3d 265 (5th Cir. 1999) (Circuit Judge Benavides, dissenting; district court found that suspected drug smugglers were not arrested when placed in a jail cell by border patrol agents, and noting other decisions sanction use of handcuffs based on reasonable suspicion), *cert. denied,* 530 U.S. 1222 (2000); *United States v. Tehrani,* 49 F.3d 54 (2nd Cir. 1995) (border patrol agent detaining traveler in small office in airport and not allowing traveler to board connecting flight not a *de facto* arrest); *Garza v. United States,* 881 F. Supp. 1099 (S.D. Tex. 1995) (roving border patrol use of "felony stop tactics not a *de facto* arrest); *see generally, The Thirty-Second Annual Review of Criminal Procedure,* 91 GEO. L.J. 1, at 36-49 (2003) (collecting cases re: investigatory detentions, including what restraints are reasonable during such detentions); *id.* at 95-100 (collecting cases re: border searches generally).

Finally, the "good faith" inquiry also is not a wholly subjective inquiry.  As I understand the New Mexico cases, the inquiry under state law is not only a subjective one (that is, what did the officers believed they had the authority to do), but also an objective one (that is, whether a "prudent and cautious person" would reach that same conclusion based on the information and situation at hand).[7]  Also, the New Mexico Supreme Court *Ryder* decision would appear to hold that even acting under a mistaken belief about what authority an officer has can be reasonable under the circumstances.  *Ryder*, 98 N.M. at 319, 648 P.2d at 777.  Thus, even though the state cases I have found do not address whether the law was "clearly established," I am of the belief that ambiguity in the law is a factor I should consider in deciding whether the agents' belief was reasonable under the circumstances.

### E. The Facts Are Not Sufficiently Developed To Decide The Issues As I Have Framed Them

The facts are well-developed and undisputed as to the events that gave rise to the reasonable suspicion justifying further investigation of Plaintiffs' possible involvement with smuggling a load of aliens who had been apprehended.  On the evening in question, agents working at the Alamogordo checkpoint referred a Dodge Van to "secondary" where they discovered that the driver and five other occupants were illegal aliens.  These aliens told the

---

[7]  *Diaz,* 95 N.M. at ___, 286 P.2d at 376; *see also Romero,* 119 N.M. at ___, 859 P.2d at 215-16 (facts available to officer at time provided a reasonable belief that it was necessary to detain a person, under circumstances that were arguably a *de facto* arrest, to preserve the peace and continue investigation into a tow-bill dispute); *Ulibarri,* 75 N.M. at 519-20, 395 P.2d at 239-40 (accepting for purpose of appeal trial court's finding that circumstances did not justify a "reasonable belief" that a crime had probably been committed at the time he arrested the plaintiff); *Perea,* 94 N.M. at ___, 613 P.3d at 1040 ("'[I]t is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted,'" quoting *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 456 F.3d 1339 (2nd Cir. 1972)).

agents that family members in Chicago arranged for their transport and that they were accompanied across the border by "Mario," who then handed them off to "Rogel" to drive them northbound.[8]

While Agent Gary Gualducci remained with the Dodge Van and its occupants in secondary, Agent Humberto Valeriano returned to the primary area to continue processing the vehicles passing through the checkpoint.  Twenty minutes after the Dodge Van arrived at the checkpoint, Plaintiffs arrived in their Toyota Previa.  Sylvia told the agents that they were from Chicago and had driven from El Paso to pick up a relative who was having car trouble further up the highway toward Alamogordo.[9]  At that point Agent Joel Sims pulled into the checkpoint.[10] He was on "roving patrol" that night and had just traveled southbound on the highway from Alamogordo to the checkpoint.  Agent Sims informed other agents that he had not seen any broken down vehicles.  Apparently without informing Plaintiffs of Agent Sims' observation, Agent Valeriano referred Plaintiffs to secondary, where he asked Figueroa permission to send a dog around the car.  She consented.  The dog did not alert and the agents did not run a criminal check.  Plaintiffs went on their way toward Alamogordo.  Their entire encounter at the checkpoint

---

[8]  *See, e.g., Doc. 59,* Exh. A at 129, 131 (Deposition of Agent Gary Gualducci, hereinafter "*Gualducci Depo.,*" regardless of which pleading it accompanies); *id.,* Exh. B at 2 (INS Summary Report of Investigation, hereinafter "*Report*"); *id.,* Exh. C at 6 (Deposition of Agent Humberto Valeriano, hereinafter "*Valeriano Depo.,*" regardless of which pleading it accompanies).

[9]  *See, e.g, Valeriano Depo.* at 6; *Report* at 2-3; *Doc. 59,* Exh. E at 197-98 (Deposition of Sylvia Magadan, hereinafter "*Sylvia Depo.,*" regardless of which pleading it accompanies).

[10]  Although it is not necessarily established of record at this point, I take judicial notice that the Border Patrol maintains a checkpoint south of Alamogordo, New Mexico and the highway on which it sits is one of the routes from the Southwest to Northern parts of the United States.  The checkpoint processes vehicles headed northbound on the highway.  There is no checkpoint for southbound traffic.

lasted less than half an hour.[11]

Meanwhile, Agent Gualducci was processing the six illegal aliens who were waiting in the secondary area. During the course of those efforts, and after Plaintiffs had left the checkpoint, at approximately around 7:00 p.m. Agent Gualducci discovered that the driver's name is not simply "Rogel," but "Rogel-Figueroa." At that point he realized that Figueroa was the same name as the mother in the vehicle that arrived shortly after the Dodge Van and therefore radioed Agent Shims and asked him to intercept the Toyota and ask the women to come to the border patrol station located up the road from the checkpoint for further questions. As Plaintiffs concede, and as I so find, the agents had an ample and entirely reasonable basis for suspecting that the women in the Toyota were linked to the aliens being smuggled in the Dodge and warranted further investigation based on: the nature of alien smuggling, which can involve the use of "scout" vehicles; the shared "Figueroa" last name; the Chicago area link; the timing of the two vehicles through the checkpoint; and the ostensible falsity of the Plaintiff's stated purpose of their travel.[12] The women voluntarily accompanied the agents back to and into the station.[13]

While the events leading up to entering the station are not in dispute, what happened at the station is not developed in sufficient detail in the briefs or in the deposition excerpts I have

---

[11] *See, e.g, Sylvia Depo.* at 197-98; *Doc. 59,* Exh. G at 57 (Deposition of Agent Joel Sims, hereinafter "*Sims Depo.,*" regardless of which pleading it accompanies); *id.,* Exh. F at 85-86 (Deposition of Magdalena Figueroa, hereinafter "*Figueroa Depo.,*" regardless of which pleading it accompanies).

[12] *See, e.g., Gualducci Depo.* at 131, 145, 150-52, 155, 158-59; *Valeriano Depo.* at 7; *Sims Depo.* at 59, 83-85; *Report* at 3; *Doc. 59,* Exh. D at 72, 91,160-163 (Deposition of Supervisor Shem Peachey, hereinafter "*Peachey Depo.*").

[13] *See, e.g., Figueroa Depo.* at 87, 93-99; *Sylvia Depo.* at 199-208; *Sims Depo* at 114; *Peachey Depo.* at 75.

16

before me.  To illustrate but a few examples:  The agents' testimony indicates they were faced with a "complex" investigation that could have lasted several hours, but the reasons why they reached that conclusion are not plain from the testimony.  One reason may have been the number of people detained that night vis-a-vis the facilities available at the station, but that is pure speculation on my part.  As for the facilities, the Court was not provided with the map of the border patrol station that the deponents reviewed while giving testimony.  The layout of the station is not described with precision in the depositions.  The testimony about the number of holding cells ranges from two to three.  The number of rooms designated for interviews and the number of offices is unknown.  The women were not searched because there was no female border patrol agent at the time, but it is unclear whether there were none on duty that night or none at that station.

I cannot tell from the agents' testimony whether it was customary to put every interviewee in either a detention cell or an interview room or whether they made a decision to do so with these particular Plaintiffs.  The agents' testimony provides that it is a common practice to secure interviewees in a cell or by handcuffing them to a chair when unattended to prevent the interviewees from leaving the station or from walking freely about the station where they could mingle with the other witnesses and where there are sensitive materials, including weapons.  Again, however, it is unclear to the Court whether this was a policy followed in all cases or in this particular case for some reason.

The Report indicates that the women arrived at the station at approximately 7:35 p.m.  Although the Report states that both women were advised of their constitutional rights upon arrival at the station, and the supervisor expected that they would have been so advised for an

17

investigative detention, the Border Patrol does not have a copy of the form that memorializes the reading as having transpired.  I cannot tell from the submissions before me whether the women were read their rights or whether they were not and the Report is mistaken.  It is apparent that the agents believed they could engage in a "forcible detention" without placing the women under arrest.  In light of the *Miranda* notation in the Report, perhaps the agents are referring to a custodial interrogation.

It appears that Figueroa was placed in a holding cell immediately upon arrival at the station and that Sylvia was not handcuffed until half an hour after her arrival.  I know that the agents informed Plaintiffs that they were not under arrest.  However, it is not entirely clear when they did so, how often they did so, or what Plaintiffs responded.  According to Sylvia, in response to her question why she was being handcuffed if she was not under arrest, the agents allegedly responded that they did not want her to leave.

Finally, the general format of the investigation and processing apparently consisted of the agents conducting records checks and moving from holding place to holding place asking questions.  However, the Court is not provided the detail of who did what and when, and why they chose that procedure under the circumstances.  It is evident to me that during the course of the investigation, the agents discovered incriminating evidence that connected the women to the alien load.  The Report provides that about an hour into the investigation, the agents discovered that one of the aliens they had arrested had piece of paper in his pocket.  That paper contained the phone number of Figueroa's brother in El Paso, and was the same phone number Figueroa had provided to the agents.  In addition to the common telephone number, during the course of the investigation the agents learned other incriminating information.  Precisely when and how they

learned the information also is not clear, even though the substance of what they learned is undisputed.  The agents discovered that:  one of the Plaintiffs had in her possession papers showing that the Toyota had been seized before; the date of the prior seizure coincided that the date that the same aliens they now had in custody had been previously arrested; a "Mario" likewise brought the aliens across the border on the prior occasion; and the addresses for the vehicle registrations of the Toyota and Dodge showed them to be registered to people who lived within the same neighborhood in Chicago.  I am of the opinion that the agents developed probable cause, but I leave it to the parties to argue precisely when that happened.

I recognize that the agents and Plaintiffs were not deposed until years after the events occurred and that it may not be possible to recall everything in detail.  On the other hand, I cannot tell from the excerpts before me whether counsel even pursued these avenues of inquiry, which is understandable since they were not aware of my position on the issues at the time they took the depositions.  The parties have not had an opportunity to focus their arguments on the issues as I have thus framed them, and that, coupled with the lack of detail regarding the applicable underlying factual background, leads me to conclude that a decision on summary judgment is inappropriate at this juncture.

## IV.  Discovery-Related Motions

Defendant asserts that Figueroa has refused to provide any evidentiary material to support her claim of $200,000 for pain and suffering.  Defendant also moves to preclude Figueroa from introducing any evidence of damages based on treatment she received from Dr. Miguel A. Burgos or at the Illinois Masonic Medical Center because she failed to disclose these providers in her initial disclosures or before the end of discovery.  Defendant moves to dismiss Figueroa's claim

since without evidence supporting her claim to damages, she cannot prove any injury.  *See Doc. 57* at 4.

Likewise, Defendant also moves to preclude Sylvia from introducing any evidence of damages based on treatment she received from Dr. Burgos, or at Resurrection Healthcare, or at Resurrection Medical Center because she failed to disclose these providers in her initial disclosures or prior to the close of discovery.  *Id.* at 3-4.  In a separate motion, Defendant moves to exclude Grace Gianforte as an expert witness for Sylvia because she failed to provide in detail her prior expert testimony and because her calculation of Sylvia's damages are speculative.  *See Doc. 55* at 1-2.  Specifically, Defendant asks the Court to exercise its gatekeeping function under *Daubert* and exclude Ms. Gianforte's calculation of $45,000 as lost wages as unreliable and irrelevant under FED. R. EVID. 702.  *See id.* at 10.  Defendant does not argue that Sylvia's claim is subject to dismissal if evidence from the providers and expert are excluded.

I agree that Plaintiffs' response indicates that they are not going to use the belatedly-produced information from Dr. Burgos, Resurrection Healthcare, or Resurrection Medical Center. I would exclude the evidence in any event because it was not timely provided.

As for the Illinois Masonic Medical Center, Plaintiffs argue that Figueroa identified the center in her deposition prior to the close of discovery and Defendant could have secured the records because it already had her signed release.  However, the portion of the deposition that mentions the visit to the center does not do so in sufficient detail for Defendant to have determined where it was located.  Furthermore, it was incumbent on Plaintiffs to provide that information to Defendant.  Accordingly, I grant the motion to exclude the evidence.

Other than work product of her attorney and what she provided in her deposition,

20

Figueroa has no documents that support her calculation of damages.  However, uncertainty as to the amount of damages does not preclude her from recovering something if Defendant is found liable.  *See Ulibarri,* at 240-41.  As the factfinder at the nonjury trial, I will be making the decision what she should recover, if anything.  Of course, punitive damages are not recoverable.  *E.g., Carlson v. Green,* 446 U.S. 14, 22 (1980).  Accordingly, to the extent Defendant seeks dismissal of Figueroa's claim, the motion is denied.

The only remaining damages issue is the *Daubert* motion concerning Ms Gianforte opinions.  I defer ruling on the *Daubert* motion at this time, preferring instead to hold a hearing before the expert is to testify.

Wherefore,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.  Defendant's motion for summary judgment *(Doc. 58)* is **denied at this time**;

2.  Defendant's motion to dismiss Figueroa's claim for failure to support her damages claim *(Doc. 57)* is **denied**;

3.  Defendant's motion to exclude evidence of damages by Dr. Miguel A. Burgos, Illinois Masonic Medical Center, Resurrection Healthcare, or Resurrection Medical Center is **granted**;

4.  Defendant's *Daubert* motion *(Doc. 55)* is **taken under submission** for ruling at trial; and

5.  It appearing Lynn Coyle and Javier Maldonado are members in good standing of the Illinois and Texas state bars, respectively, their motion to be admitted to practice and to sign pleadings *(Doc. 68)* is **granted.**

**IT IS FURTHER ORDERED** that, if based upon this Memorandum Opinion and Order, the parties feel that a conference with the Court is advisable, they are to contact my Administrative Assistant Dixie Johnson (505/528-1480) to schedule a status conference with me as soon as possible.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.