**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MAGDALENA FIGUEROA, and
SYLVIA MAGADAN,

          Plaintiffs,

    vs.                        Civil No. 02-CV-1086 KBM/LCS

UNITED STATES OF AMERICA,

          Defendant.

**DEFENDANT'S PROPOSED**
**FINDINGS OF FACT  AND  CONCLUSIONS OF LAW**

Defendant United States of America, by and through its undersigned attorneys, proposes

the following Findings of Fact and Conclusions of Law in this matter, in addition to the

stipulated Findings of Fact and Conclusions of Law submitted separately to the Court.

**Proposed Findings of Fact**

1.      Plaintiff Figueroa's full name is Magdalena Cardenas de Figueroa, and she uses

the last name of Figueroa.

2.      One of the main missions of the Border Patrol is to detect and prevent the

smuggling and illegal entry of aliens into the United States.

**Part I - CHECKPOINT**

3.      On August 4, 1999, at approximately 5:10 pm a Dodge van entered the Border

Patrol Alamogordo checkpoint on Highway 54, south of Alamogordo, in which Agents

discovered six illegal aliens, including the driver.  The Agents began to process the six illegal

aliens at the checkpoint south of Alamogordo on Highway 54.

4.  Before the Dodge van entered this checkpoint, it had been raining and the Agents had

closed the checkpoint.  The Dodge van was the first or one of the first vehicles into the

checkpoint after it was reopened following the rain.

5.   On August 4, 1999, at approximately 5:30 pm a Toyota van entered the same checkpoint, and Plaintiffs were the occupants of this van.  After pulling the Toyota van into secondary inspection, the Agents released the Toyota van to continue north on Highway 54 towards Alamogordo.

6.   While at the checkpoint, Plaintiffs informed the Agents that the purpose of their trip was to find a relative whose vehicle had broken down on the side of Highway 54 between the checkpoint and the city of Alamogordo.

7.   While the Toyota van was at the checkpoint, the Agents determined that in fact there were no broken down vehicles on Highway 54 between the checkpoint and the city of Alamogordo.

8.   After Plaintiffs cleared the checkpoint, at approximately 7:00 pm while processing the six illegal aliens, the Agents determined that the last name of the alien driver of the Dodge van (Salatiel Rogel-Figueroa) matched the last name of one of the Plaintiffs (Magdalena Figueroa).

9.   At approximately 7:00 pm, while processing the six illegal aliens, the Agents determined that Mr. Rogel-Figueroa lived in Chicago, and Plaintiffs had told the Agents that they lived in Chicago.

10.   An Agent at the checkpoint processing the six illegal aliens radioed an Agent on the highway that the Toyota van and the Dodge van were possibly connected regarding alien smuggling.

11.   At approximately 7:15 pm an Agent stopped the Toyota van heading south on

Highway 54, between the station and the checkpoint.

12.  Plaintiffs concede that the agents had reasonable suspicion to engage in a brief investigatory stop, and voluntarily accompanied the Agents to the station.

13.  Once Plaintiffs agreed to go to the Border Patrol station in Alamogordo, the Agents transported and escorted Plaintiffs to the station.  Plaintiff Figueroa got into the Border Patrol vehicle, and Plaintiff Magadan followed in the Toyota van, as it was customary for the Border Patrol to separate suspected alien smugglers so they did not have a chance to compare stories.

14.  The Agents also transported the six illegal aliens from the checkpoint up to the station since the station was larger than the checkpoint, with more cells, to accommodate the group of six aliens and two suspected smugglers.   The investigation could be performed more easily at the station than at the checkpoint.

### Part II - STATION

15.  At 7:35 pm at the Alamogordo station the Agents advised both Plaintiffs of their rights, per form I-214, in English for Plaintiff Magadan and in Spanish for Plaintiff Figueroa.  If Plaintiffs signed those forms, they are no longer available and were not kept since Plaintiffs were released at the end of the investigation.

16.  In any custodial interrogation that could lead to an arrest, the individuals to be questioned should be read their rights first, as a precautionary measure in case the investigation does lead to an arrest.  In this case, with Agent Peachey present, the most senior agent involved, Plaintiffs were read their rights as soon as they were brought into the station, before their custodial interrogation commenced.

17.   No female Agents worked at the Alamogordo station at that time, so a female Agent

was not available to search or pat down Plaintiffs when they arrived at the station.

18.  Anyone in custody is considered a threat until proven otherwise for reasons of officer safety.

19.  When Plaintiffs arrived at the station, the six illegal aliens already occupied two of the three holding cells.  The aliens were separated into more than one cell as it was customary to at a minimum separate the men from the women and children.  There was only one empty holding cell when Plaintiffs arrived at the station.

20.  At the station the agents use holding cells to isolate suspected smugglers, and if full then they use the interview rooms.  This was the procedure followed in this case.

21.  Plaintiff Figueroa was placed in the empty holding cell.

22.  At the station the agents typically secure suspected smugglers in holding cells and when they are full, then in interview rooms, handcuffed when unattended.  This was the procedure followed in this case.

23.  Since no holding cells were left, and since it was customary to separate suspected alien smugglers,  Plaintiff Magadan was placed in an interview room.

24.  It was reasonably necessary to separate both Plaintiffs from each other and from the illegal aliens during the investigative detention.

25.  Since the holding cells were full, it was reasonably necessary to confine Plaintiff Magadan to the interview room, a non-secure room, and handcuffing one wrist to the arm of her chair was a reasonable means by which to do so when she could not be constantly monitored by an agent.

26.  The Agents questioned Plaintiff Magadan for the first thirty minutes she was in the

interview room. When the Agents left and would no longer be in the room with Plaintiff

Magadan, the Agents handcuffed one of Plaintiff Magadan's wrists to the arm of the chair she

was in since the door to the interview room did not lock and there were weapons and sensitive

information available in the station outside the interview room.  It was customary in

circumstances like this, given the number of interviewees involved, to use an interview room,

and to use a means of securing the interviewee inside the interview room when constant

monitoring was not possible since the interview room did not lock like a holding cell.

27.  The Agents proceeded to repeatedly question each Plaintiff and the illegal aliens in

order to investigate their suspicion of alien smuggling by Plaintiffs.  Repeated questioning like

this is a standard investigatory technique.

28.  During questioning, both Plaintiffs said they were visiting from Chicago, staying

with Plaintiff Figueroa's brother in El Paso, and that his phone number was 915-592-8834. This

phone number was also found by the Agents in the Toyota van that Plaintiffs had been driving.

29.  At approximately 8:35 pm, the Agents found this same phone number on a piece of

paper in the pocket of one of the illegal aliens.

30.  Plaintiffs denied any relationship to the illegal aliens and said they had no knowledge

of how the illegal alien came into possession of the El Paso phone number.

31.  During the investigation the Agents seized both vans and commenced the necessary

forfeiture  processing for both vans.  The precise time when this occurred is unknown.

32.  During the investigation the Agents called the common El Paso phone number

several times.  The precise time when these calls were placed is unknown.

33.  During the investigation the Agents found that the alien driver, Mr. Rogel-Figueroa,

had been arrested several times previously.  The precise time when this was discovered by the Agents is unknown.

34.  During the investigation the Agents found that this same group of six illegal aliens had been previously apprehended in an alien smuggling case at Santa Teresa, New Mexico, in which a vehicle was seized and the name "Mario" was mentioned as a possible smuggler.  The precise time when this was learned is unknown.

35.  "Mario" was also the name of the contact person for the six illegal aliens in El Paso, and he provided them with the Dodge van for the apprehension at issue.

36.  This prior apprehension and seizure at the Santa Teresa, New Mexico, Border Patrol checkpoint or station occurred three days earlier, on August 1, 1999.  The precise time when this was determined is unknown.

37.  Plaintiff Figueroa informed the Agents that the Border Patrol had seized a vehicle of theirs (either the same van or another vehicle), and that Plaintiffs would get this van back just like the last time.  The precise time when this occurred is unknown.

38.  The Agents understood that the recent seizure of Plaintiffs' vehicle occurred at Fort Hancock, Texas.  The precise time when the Agents knew this is unknown.

39.  It has later been determined that the dates that Plaintiff Magadan had had a vehicle seized by the Border Patrol were July 1, 1999, in the Tucson sector, and July 22, 1999, at Fort Hancock.

40.  During the investigation the Agents used the computer to check the Chicago addresses for Plaintiffs and for Rogel-Figueroa, and found that they were just blocks apart, in the same neighborhood.  The precise time this was learned is unknown.

41.  During their investigatory detention, the Agents repeatedly told Plaintiffs at the beginning and during the investigation that they were not under arrest, but the Agents do not recall how many times or the precise time when any one of them said this to each Plaintiff.

42.  From about 8:30 to 9:30 pm the Agents processed the paperwork for each of the six illegal aliens, including adding the illegal aliens to the Enforce database.

43.  Between about 9:30 and 11:30 pm the Agents took the pictures of the illegal aliens as part of the booking process.

44.  Shortly after 11 pm the Agents were checking the CIS and TECS computer databases for Salatiel Rogel-Figueroa, the illegal driver.

45.  This was a complex investigation due to the number of individuals involved (eight), given the number of holding cells (3) and interview rooms (1) available that night, and layout of the station with weapons and sensitive information available to someone not restrained in a holding cell or interview room and not under constant supervision. When a case involves so many interviewees who cannot each be monitored at all times, the apprehended aliens and the suspected smugglers are always restrained so as not to allow them to freely roam about the Border Patrol facility.

46.  Objectively, the agents' belief in their authority to conduct the investigatory detention the way that it was performed was reasonable under the circumstances, based on the information and situation at hand.

47.  Plaintiffs concede and the Court finds the agents had ample and entirely reasonable basis for suspecting that the women in the Toyota were linked to the aliens being smuggled in the Dodge and warranted further investigation based on: the nature of alien smuggling, which

can involve the use of "scout" vehicles; the shared "Figueroa" last name; the Chicago area link; the timing of the two vehicles through the checkpoint; and the ostensible falsity of the Plaintiffs' stated purpose of their travel.

48.  During the investigation the agents developed probable cause to arrest Plaintiffs based on: the same El Paso telephone number for Figueroa's brother being found on a paper in the pocket of one of the aliens; one of the Plaintiffs had in her possession papers that a vehicle of theirs had been seized before; the date of the prior seizure coincided with the date that these same six aliens had been previously arrested; a "Mario" brought the aliens across the border on the prior occasion as well as on this occasion; the two addresses in Chicago for the Plaintiffs and for  Rogel-Figueroa were in the same neighborhood in Chicago.

49.  The agents are unable to recreate when each piece of information was discovered during the course of their investigation, but the Court finds that objectively they developed probable cause to arrest Plaintiffs based upon suspicion of alien smuggling.

50.  Since the agents developed probable cause for an arrest based upon an objective standard, Plaintiffs claims therefore fail as a matter of law.

51.  Further, the Court finds that even though the objective standard for probable cause for an arrest was met, the agents determined that actually arresting Plaintiffs would be futile since the U.S. Attorney's Office would decline prosecution without either a confession from Plaintiffs or one of the aliens being a material witness and providing a statement against Plaintiffs as smugglers.

52.  Between 11 pm and midnight the Agents determined that they had completed their investigation of the two Plaintiffs and six illegal aliens.  While the agents could objectively

support an arrest based on probable cause, they knew that the case would not be accepted by the U.S. Attorney's Office, and that a conviction could not be obtained, without a statement from one of the aliens as a material witness identifying the Plaintiffs as being involved smuggling the aliens into the country before they were caught at the Alamogordo checkpoint.  Therefore, without a statement from a material witness, an arrest , although supportable, would have been futile.

53.  An Agent drove Plaintiffs into Alamogordo to a motel near the Greyhound bus station, although Plaintiffs admitted that their relatives in El Paso offered to drive to Alamogordo and pick them up that night.

54.  Alien smuggling cases are the most difficult to prosecute because they require a statement from the alien against the smuggler.  Also, the Border Patrol lacks resources for any followup investigation, which in the case could have included obtaining files of Plaintiffs' previous vehicle seizures, files of the aliens' previous arrests, and locating Plaintiff Figueroa's ex-husband, Mr. Figueroa, for questioning about his extended family members.

55. There was a reasonable basis to detain Plaintiffs for investigation for about four hours in the station.

56.  Neither Plaintiff provided a confession nor did any of the illegal aliens provide a statement as a material witness.

57.  Therefore the Agents could have arrested Plaintiffs but chose not to since they knew the case would not be accepted for prosecution and could not result in a conviction.

58.  Any and all claims related to the seizure of Plaintiffs' van  have been waived, which Defendant asserts includes the search incident to the seizure. The search itself of Plaintiff's van

is not relevant and is not part of the Complaint  Any such issues are not properly before the

Court. As a result of the search the Agents found the El Paso phone number in Plaintiffs' van,

confirming the same phone number that Plaintiffs had told them was the number of the relative

whom they stated they were visiting in El Paso.

59.   Plaintiff Figueroa has no documents to support her calculation of damages,

other than work product of her attorney and information provided in her deposition testimony.

60.   Plaintiff Figueroa cannot present as damages any evidence regarding her visit to

Illinois Masonic Center in October 1999.


**Proposed Conclusions of Law**

1.   Plaintiffs Magdalena Figueroa and her adult daughter, Sylvia Magadan, filed this

personal injury action under the Federal Torts Claims Act ("FTCA") alleging one count:  false

imprisonment.  (Doc. 1, Complaint.)

2.   Plaintiffs did not bring a <u>Bivens</u> action for constitutional torts against any of the

individual Border Patrol Agents involved in this incident.  <u>Bivens v. Six Unknown Named</u>

<u>Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

3.   The United States is the sole defendant in this action, and is immune from suit unless

it has consented to be sued under the FTCA.

4.   Plaintiffs claim the intentional tort exception of 28 U.S.C. 2680(h) in this matter.

5.   In accordance with the language of 28 U.S.C. § 1346(b) of the FTCA, the United

States's liability is to be determined by the application of the law of the place where the act or

omission occurred.

6.   Under New Mexico law, when the person who confines the plaintiff is a law enforcement officer, claims for false arrest, false imprisonment, and unlawful detention are analyzed under the same principles, which in this case are Plaintiffs' burden to prove: "intentionally confining or restraining another person without [her] consent and with knowledge that he has no lawful authority to do so." Romero v. Sanchez, 119 N.M. 690, 693, 895 P.2d 212, 215 (N.M. 1995)(quoting NMSA § 30-4-3); see also Scull v. New Mexico, 236 F.3d 588, 599 (10th Cir. 2000)

7.   Plaintiffs must prove the critical elements of lack of consent and unlawfulness of detention.

8.   The lawfulness of the detention is measured by whether probable cause exists for the arrest/imprisonment/detention. See Ulibarri v. Maestas, 74 N.M. 516, 518-20, 395 P.2d 238, 239-40 (N.M. 1964).

9.   The defense to a false imprisonment/arrest/detention claim is generally referred to as "good faith [of the officer] and probable cause." See, e.g., Pierson v. Ray, 386 U.S. 547, 555-56 (1967); State v. Johnson, 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54 (N.M. 1996).

10.   In the context of the defense, "probable cause" means "an honest belief on the part of the defendants, based on reasonable grounds, that plaintiffs should be detained." Diaz v. Lockheed Electronics, 95 N.M. 28, 32, 618 P.2d 372, 376 (N.M.Ct.App. 1980).

11.   Even if Plaintiffs were de facto arrested, their claim necessarily fails because they cannot meet their burden of establishing the unlawfulness element of the tort. See, e.g., Ulibarri, 74 N.M. at 519-20, 395 P.2d at 420.

12.   Since Plaintiffs cannot meet their burden of establishing one of the essential

elements of the tort, the Court need not reach the issue of whether Defendant has sustained its burden on establishing the defense.  See, Diaz, 95 N.M. at 32, 268 P.2d at 376.

13.  The Court decides whether, objectively, there is probable cause to support an arrest. See, e.g., Ornelas v. United States, 517 U.S. 690, 696-97 (1996).  An officer has probable cause to arrest if, under the totality of the circumstances, he "learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested."  United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir.)(citations omitted), cert. denied, 525 U.S. 978 (1998). Probable cause is measured "against an objective standard" and evaluated "in relation to the circumstances as they would appear to a prudent, cautious and trained police officer."  United States v. Santana-Garcia, 264 F.3d 1188, 1192 (10th Cir. 2001).

14.  The Court also decides whether a longer detention for additional questioning is permissible if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.  United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998).

15.  Before probable cause to arrest Plaintiffs may have been objectively established, it was a reasonable investigative detention because the agents were reasonably and diligently pursuing the investigation as rapidly as possible. United States v. Sharpe, 470 U.S. 675, 686 (1985).

16.  Defendant has not conceded lack of probable cause as a matter of law, and evidence need not support a conviction in order to support a finding of probable cause.  See Maryland v. Pringle, __ U.S. __, 124 S.Ct. 794, 800 (2003); see also Johnson, 122 N.M. at 701, 930 P.2d at

1153.

17.  A law enforcement officer can be objectively justified in arresting someone for an offense, even if there is insufficient evidence at that time to support a conviction.  See Id.

18.  Probable cause is an objective inquiry made in hindsight based on all of the circumstances of a particular case.  Id.  Probable cause is based on an "objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind," (Olsen v. Layton Hills Mall, 312 F.3d 1304, 1322 (10th Cir. 2002)(Hartz, concurring in part, dissenting in part)),  or perceptions at the time, or "what the officer may have called it at the time."  Wayne R. LaFave et al., 2 Criminal Procedure § 3.8(b)(2d ed. 1999); see Maryland v. Macon, 472 U.S. 463, 470-71 (1985).

19.  To establish the unlawfulness element of the tort under state law, Plaintiffs must show that the agents "knew they had no lawful authority" to detain them for questioning, one in a cell and one handcuffed to the arm of a chair.  Scull, 236 F.3d at 599.

20.  Fourth Amendment principles apply to the reasonableness of a detention, regardless of whether the officer actually had authority to do what he did.  See State v. Ryder, 98 N.M. 453, 456, 649 P.2d 756, 759 (N.M.Ct.App. 1982).

21.  New Mexico law on detainments, whether a person can be detained, states that "an officer may approach a person to investigate possible criminal behavior even though the officer may not have probable cause for an arrest" if the officer can "specify facts which, together with rational inferences [therefrom], reasonably warrant the intrusion.  These facts are to be judged by an objective standard – would the facts available to the officer warrant a person of reasonable caution to believe the action taken was appropriate?"  State v. Lewis, 80 N.M. 274, 276, 454

P.2d 360, 362 (Ct.App. 1969)(citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

22.   Plaintiffs' claim fails as a matter of law because the investigatory detention never ripened into a de facto arrest, based on an objective inquiry balancing various factors.  Plaintiffs' belief that they were not free to leave and whether that belief was reasonable is not the sole inquiry.  <u>See</u> Doc. 79, Mem. Op. and Order, pp. 12-13.

23.   Plaintiffs' respectively being held in a cell and having one arm handcuffed to a chair is not dispositive of whether the detention was a de facto arrest.  <u>See</u> <u>Gallegos v. City of Colo. Springs</u>, 114 F.3d 1024, 1030 (10th Cir. 1997).

24.   Even if the Court finds that the investigatory detention did ripen into a de facto arrest, the agents objectively had probable cause for an arrest, and a claim for false arrest, false imprisonment, or unlawful detention is analyzed under the same principles anyway.  <u>See</u> Doc. 79, Mem. Op. and Order, pp. 6-8, 19.

25.   Subjectively, the agents believed under the circumstances that they had the authority to detain Plaintiffs in the manner they were so detained.  <u>Diaz</u>, 95 N.M. at __, 286 P.2d at 376; <u>Romero</u>, 119 N.M. at __, 859 P.2d at 215-16.

26.   Even if the agents were acting under a mistaken belief about what authority they had, that can be reasonable under the circumstances.  <u>Ryder</u>, 98 N.M. at 319, 648 P.2d at 777.

27.   Plaintiff Magadan's expert Gianforte failed to provide all of her prior testimony as required by Fed. R. Civ. P. 26(a)(2).

28.   Gianforte's testimony regarding any lost wages of Plaintiff Magadan is speculative and inadmissible.  F.R.E. 702; <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

29.   Plaintiff Figueroa has only her attorneys' work product and her own testimony to support any claim for damages.  Doc. 79, Mem. Op. and Order, pp. 20-21.

30.   Judgment should be granted to Defendant United States of America, which is entitled to allowable costs as the prevailing party.  28 U.S.C. § 1920; Fed. R. Civ. P. 54; D.N.M.LR-Civ. 54.

Respectfully submitted,

DAVID C. IGLESIAS
United States Attorney

 Electronically filed 3/1/04 
CYNTHIA L. WEISMAN
JOHN W. ZAVITZ
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
Tel: (505) 346-7274
Fax: 505-346-7205

OF COUNSEL:
Christopher Ryan
U.S. Dept. of Homeland Security
Bureau of Customs & Border Protection
U.S. Border Patrol
8901 Montana Ave.
El Paso, TX 79925

I hereby certify that on March 1, 2004 a true copy of the foregoing pleading was mailed and faxed to opposing counsel of record:

Javier Maldonado
Lawyers' Committee for Civil Rights Under Law of Texas
118 Broadway, Suite 502
San Antonio, TX 78205

 Electronically filed 3/1/04 
CYNTHIA L. WEISMAN
Assistant U.S. Attorney

N:\CWeisman\Cases-New\Figueroa\TRIAL\FOF and COL.wpd