IN THE UNITED STATES DISTRICT COURT
FOR NEW MEXICO
LAS CRUCES DIVISION

**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

MAGADALENA FIGUEROA, and
SYLVIA MAGADAN

    Plaintiffs,

v.

UNITED STATES OF AMERICA

    Defendants.

§
§
§
§
§
§
§
§
§
§
§

MAR 1   2004

CIVIL NO. 02-1086
KBM/JHG-ACE

CLERK

BY _____ DEP. CLERK

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, through their undersigned counsel, submit their Proposed Findings of Fact and Conclusions of Law.  In support of their submission, Plaintiffs tender the following:

### *The Parties*

1.    Plaintiff Magdalena Figueroa (hereinafter "Magdalena") is a lawful permanent resident and a long time resident of Chicago, Illinois.  She has no criminal record.  Testimony (Test.) of M. Figueroa.

2.    Plaintiff Silvia Magadan (hereinafter "Silvia") is a United States citizen and a resident of Chicago, Illinois.  She has no criminal record.  Test. of S. Magadan.

3.    Plaintiffs Magdalena and Silvia are mother and daughter, respectively.  Test. of M. Figueroa and S. Magadan.

4.    The United States is a sovereign nation responsible for enforcement of the immigration laws by the officers, agents and employees of the Immigration and Naturalization Service and the U.S. Border Patrol.  Test. of G. Gualducci and S. Peachy.

### Nature of the Action

5.    This is a civil action under the Federal Tort Claims Act ("FTCA"), 28

1

U.S.C. §§ 1346, 2671-2680, and the laws of New Mexico.

6.     Plaintiffs contend that Defendants unlawfully detained Plaintiffs and that such detention resulted in false arrest and/or imprisonment.

7.     On July 31, 2001, Plaintiffs filed timely administrative complaints alleging personal injuries by federal agents and requested $200,000 in damages for each plaintiff. Plfs.' Exhs. 1 and 2.

8.     On March 2, 2002, Defendant denied Plaintiffs' administrative complaints. Plfs.' Ex. 3.

9.     Plaintiffs timely filed this federal lawsuit. Test. of M. Figueroa and S. Magadan.

### Factual Background

10.     In the late summer of 1999, Magdalena and Sylvia traveled to El Paso, Texas to visit with extended family members. Test. of M. Figueroa and S. Magadan.

11.     At that time, Sylvia was nineteen (19) years old. She was on summer break after successfully completing her first-year of studies at the University of Illinois College of Engineering. Test. of S. Magadan.

12.     Magdalena was on vacation from her job at a factory where she had worked for over twenty years. Test. of M. Figueroa.

13.     On the afternoon of August 4, 1999, Magdalena and Sylvia learned that a family member, Sifredo Cardenas, needed assistance because his van had broken down near Alamogordo. Plaintiffs offered to drive to New Mexico and find their relative. Test. of M. Figueroa and S. Magadan.

14.     At approximately 5:10 p.m., that same afternoon of August 4, 1999, a Dodge van entered the Border Patrol checkpoint on Highway 54, south of Alamogordo. During the course of investigating the citizenship status of the driver and passenger, Border Patrol Agent (BPA) Gualducci

discovered that there were other individuals in the van. None of the persons in the van had lawful status in the United States. Test. of G. Gualducci.

15. The driver and the passengers were placed under arrest and BPA Gualducci began processing them. Test. of G. Gualducci.

16. At 5:30 p.m., that same afternoon, Plaintiffs' Toyota van entered the same Alamogordo/Highway 54 checkpoint. Test. of M. Figueroa, S. Magadan, J. Sims, and H. Valeriano. BPA Valeriano was working the primary inspection lane at that time. Test. of H. Valeriano. While investigating Plaintiffs' immigration status and travel plans, BPA Valeriano spoke with Supervisory Border Patrol Agent (SBPA) Joel Sims regarding Plaintiffs' story that a relative's car was stranded on Highway 54. Test. of H. Valeriano and J. Sims. SPBA Sims stated that he had not seen a broken down vehicle on Highway 54. Test. of J. Sims. BPA Valeriano then decided to send Plaintiffs' van to secondary inspection. Test. of H. Valeriano.

17. In secondary inspection, BPA Valeriano instructed Plaintiffs to step outside of the van. He then carefully searched the inside of the vehicle and reviewed Plaintiffs' documentation a second time. Finding nothing unlawful or suspicious, BPA Valeriano released Plaintiffs and allowed them to continue on their journey. Test. of H. Valeriano.

18. Plaintiffs reached Alamogordo without seeing Sifredo's car on the highway. Test. of M. Figueroa and S. Magadan.

19. In Alamogordo, Plaintiffs drove to a gas station. At the station, Silvia called her relatives in El Paso to ask about Sifredo and his whereabouts. Relatives informed Sylvia that Sifredo had called El Paso to say that he got the car started and was heading home. Plaintiffs decided to return to El

3

Paso. Test. of M. Figueroa and S. Magadan.

20.   More than an hour after Plaintiffs had cleared the checkpoint, at
      approximately 7 p.m. that same evening, SBPA Sims received instructions
      to stop Plaintiffs' van. Test. of J. Sims. While driving south on Highway
      54, SBPA Sims recognized Plaintiffs' van driving south on Highway 54.
      At approximately 7:15 p.m., SBPA Sims stopped Plaintiffs van on
      Highway 54. Id.

21.   Once Plaintiffs' van had been stopped, SBPA Sims asked for Sylvia's
      driver's license and Magdalena's legal permanent resident card. The agent
      explained that Border Patrol was detaining an alien smuggler who shared
      Magdalena's last name. The agent asked Plaintiffs whether they would
      agree to go to the Border Patrol station so that Magdalena could answer
      some questions. Test. of J. Sims.

22.   Plaintiffs agreed to go to the Border Patrol station because it was clear to
      them that they could not refuse SBPA Sims' invitation. Test. of M.
      Figueroa and S. Magadan.

23.   SBPA Sims instructed Magdalena to ride with him in the Border Patrol
      vehicle. Test. of S. Magadan, M. Figueroa and J. Sims. Silvia followed
      SBPA Sims as they made a U-turn to go to the Border Patrol station. Test.
      of S. Magadan, M. Figueroa and J. Sims. At some point, another Border
      Patrol vehicle followed behind Silvia to "escort" her. Test. of S. Magadan.
      This practice is used by Border Patrol to ensure that a vehicle will not flee.
      Test. of J. Sims, S. Peachey, G. Gualducci, and H. Valeriano.

24.   On the drive to the Border Patrol station, SBPA questioned Magdalena
      about where she lived, for how long, and how many children she had.
      Test. of M. Figueroa.

25.   SBPA Sims and Magdalena arrived at the Border Patrol station sometime

4

berforc 7:35 p.m. At the Border Patrol station, SBPA Sims escorted Magdalena inside and placed her in a locked holding cell. Test. of M. Figueroa. Approximately fifteen (15) minutes later, SBPA Sims returned with other agents and began interrogating Magdalena. Id. During the course of the next 4 hours, Border Patrols agents would come and interrogate Magdalena with the same questions. Id. Magdalena always denied she was involved in alien smuggling or had a son named Rogel. Id. The agents would then leave. Id. Every time Magdalena was left alone in the cell, the cell door was locked. Test. of M. Figueroa, J. Sims, and G. Gualducci.

26.    Silvia drove to a parking lot near the station and waited in the van while her mother answered questions for Border Patrol. Test. of S. Magadan.

27.    After a few minutes, an agent came to Silvia's car and asked her to accompany the agent into the station. Test. of S. Magadan.

28.    As she exited the vehicle, Silvia reached for her camera case. The agent then put his hand on his gun and asked Silvia what she was doing. Silvia explained that she was reaching for her camera case to bring along because in it she carried her identification documents and a camera. With his hand still on his gun, the agent asked Silvia if he could inspect her case. Silvia opened the case for the agent to see inside. The agent then took Silvia to the station. Test. of S. Magadan.

29.    Before 7:35 p.m., both plaintiffs were already in the Border Patrol station. Test. of S. Magadan and M. Figueroa.

30.    At approximately 7:35 p.m., Border Patrol agents advised Silvia and Magadalena of their constitutional rights as per <u>Miranda v. Arizona</u> and form I-214. Test. of S. Magadan, M. Figueroa, G. Gualducci and J. Sims.

31.    Border Patrol agents then began interrogating Silvia. Test. of S. Magadan.

5

32.   Less than thirty (30) minutes after she arrived at the station, a Border Patrol agent handcuffed Silvia to her chair.  The agents then left but not before closing the door.  For the next 4 hours, Border Patrol agents would return to interrogate Silvia and leave but she remained handcuffed the whole time.  At some point during the interrogation, an agent loosened Magdalena's handcuffs but did not remove them.  Test. of S. Magadan.

33.   During the course of the interrogation, Silvia and/or Magdalena provided Border Patrol agents with Sifredo's telephone number in El Paso.  Test. of S. Magadan and M. Figueroa.  During the course of the next four hours, Border Patrol agents called the El Paso number to get one of Plaintiffs' relatives to come to the Border Patrol station but no one ever came to Alamogordo.  Test. of M. Figueroa.

34.   More than an hour after Plaintiffs arrived at the station and were placed in a custodial setting, a Border Patrol agent discovered a piece of paper with Sifredo's telephone number on one of the undocumented persons.  Test. of G. Gualducci and J. Sims.

35.   During the course of the investigation, Border Patrol agents checked various databases to determine Plaintiffs' immigration background and whether Plaintiffs had any outstanding warrants.  The agents discovered that Silvia and Magdalena had no outstanding warrants and their immigration status was in order.  Test. of G. Gualducci, S. Peachey, J. Sims, and J. Hitchcock.

36.   On August 4, 1999, Border Patrol agents at Alamogordo station did not have access to information relating to the seizure and/or forfeiture of any vehicles.  Test. of G. Gualducci, S. Peachey, J. Sims, and J. Hitchcock.

37.   Having found no other suspicious or incriminating evidence, Border Patrol agents decided to release Plaintiffs sometime after 11 p.m.  Test. of G.

6

Gualducci, S. Peachey, and J. Sims.

38. As the agents prepared to release Plaintiffs, the agents learned from Magdalena that a vehicle had previously been seized from one of the Plaintiffs. Test. of M. Figueroa, G. Gualducci, and S. Peachey. As Plaintiffs waited to be released from custody, Magdalena showed vehicle seizure documents to one of the Border Patrol agents. Test. of S. Peachey.

39. Based on this additional piece of information, a prior vehicle seizure, SBPA Peachey decided to seize Plaintiffs' Toyota van. Test. of S. Peachey.

40. At the Border Patrol station and while in the custody of Border Patrol, Plaintiffs did not scream, make threats, act disruptively, or behaved in any manner that made Border Patrol agents afraid for their lives or Plaintiffs' lives. Test. of S. Magadan, M. Figueroa, G. Gualducci, and J. Sims.

41. Sometime after 11 p.m., that same evening, a Border Patrol agent drove Plaintiffs to a motel. The next day, Plaintiffs took a bus to El Paso, Texas. Test. of M. Figueroa and S. Magadan.

42. For almost four (4) hours, Border Patrol agents detained and interrogated Plaintiffs. As a result of their unlawful detention, Plaintiffs suffered mental pain, anguish, humiliation, depression, and embarrassment. Test. of S. Magadan and M. Figueroa.

43. The psychological effects of the unlawful detention were so great that Silvia was forced to withdraw from her college studies and returned to Chicago. She was unable to concentrate and focus on her studies. She suffered from anxiety and had trouble sleeping. She became withdrawn and was irritable around family members. She lost and then gained significant body weight. These symptoms presented themselves for at least 6 months following her detention in August 1999. Test. of S.

Magadan and G. Gianforte.

44.   As a result of the unlawful detention, Magdalena also suffered anxiety,

stress, and had problems sleeping.  She also experienced migraine

headaches relating to stress from the unlawful arrest and which prompted

her to visit an emergency room sometime in October 1999.  Test. of M.

Figueroa and Pfs'. Ex. 30.

## CONCLUSIONS OF LAW

### Federal Tort Claims Act

45.   Plaintiffs assert a claim for false imprisonment and/or false arrest under

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

46.   Filing an administrative complaint is a prerequisite to filing suit under the

FTCA.  28 U.S.C. § 2675(a).  Plaintiffs met this requirement by filing their

claim on July 31, 2001, with the Department of Justice and requesting

damages in the amount of $200,000 each.  The former INS denied

Plaintiffs' claims on March 2, 2002.

47.   The FTCA provides that the United States can be liable

> for injury or loss of property, or personal injury or death caused
> by the negligent or wrongful act or omission of any employee
> of the Government while acting within the scope of his office
> or employment, under circumstances where the United States,
> if a private person would be liable to the claimant in
> accordance with the law of the place where the act or omission
> occurred.

28 U.S.C. § 1346(b)(1).

48.   "The United States shall be liable . . . in the same manner and to the same

extent as a private individual under like circumstances, but shall not be

liable for interest prior to judgment or for punitive damages."  28 U.S.C. §

2674.

49.   Moreover,

> with regard to acts or omissions of investigative or law
> enforcement officers of the United States Government, the

8

> provision of this chapter and section 1346(b) of this title shall
> apply to any claim arising . . . out of . . . false imprisonment
> [or] false arrest . . . . For the purpose of this subsection,
> 'investigative or law enforcement officer' means any officer of
> the United States who is empowered by law to execute
> searches, to seize evidence, or to make arrests for violations of
> Federal law.

28 U.S.C. § 2680(h).

50.    Border Patrol agents Gary Gualducci, Shem Peachey, Joel Sims, Humberto

Valeriano and Joshua Hitchcock are law enforcement officers within the

meaning of 28 U.S.C. § 2680(h).

**New Mexico Law:  False Arrest/False Imprisonment**

51.    Because the acts Plaintiffs complain of occurred in New Mexico, the

liability of the United States must be determined according to New

Mexico state law.  28 U.S.C. § 1346(b)(1).

52.    "Under New Mexico law, '[f]alse imprisonment consists of intentionally

confining or restraining another person without his consent and with

knowledge that he has no lawful authority to do so.'" Romero v. Sanchez,

119 N. M. 690, 693, 895 P.2d 212, 215 (N.M. 1995)(quoting

N.M.Stat.Ann. § 30-4-3); see also Scull v. New Mexico, 236 F.3d 588,

599 (10th Cir. 2000).

53.    Plaintiffs therefore are "required to show that (1) [defendants]

intentionally confined or restrained [them] without [their] consent and (2)

the [defendants] knew that they had no lawful authority to do so." Scull v.

New Mexico, 236 F.3d 588, 599 (10th Cir.2000).

54.    New Mexico courts do not appear to view false arrest as a separate tort

from false imprisonment.

55.    An early New Mexico Supreme Court decision, which involved a police

officer, suggests that false imprisonment and "unlawful" arrest are the

same tort and, when the confinement is an arrest, the lawfulness of the

9

detention is measured by whether probable cause exists for the arrest. See

Ulibarri v. Maestas, 74 N.M. 516, 518-20, 395 P.2d 238, 239-40 (N.M.

1964).

56.     A 1980 New Mexico Court of Appeals decision rejected the argument that

the recognized common law defense to a false arrest claim should not be

available to a claim of false imprisonment. See Perea v. Stout, 94 N.M.

595, 600, 613 P.2d 1034, 1039 (N.M. Ct. App.), cert. denied, 449 U.S.

1035 (1980).  The defense is generally referred to as "good faith and

probable cause," and it has long been held that the defense is available for

either false arrest or false imprisonment.  See e.g., Pierson v. Ray, 386

U.S. 547, 555-56 (1967)(recognizing that "common law has never granted

police officers an absolute and unqualified immunity," court held that "the

defense of good faith and probable cause, which the Court of Appeals

found available to the officers in the common-law action for false arrest

and imprisonment, is also available to them in the action under § 1983.").

57.     More recently, in State v. Johnson, 122 N.M. 696, 930 P.3d 1148 (N.M.

1996), the New Mexico Supreme Court recognized that the defense of

"good faith and probable cause" is applicable to both torts.  Id. at at 701-

02, 930 P.2d at 1153-54.

58.     Therefore, the Court concludes that under New Mexico law, when the

person who confines the plaintiff is a law enforcement officer, false arrest

and false imprisonment are analyzed under the same principles.

59.     The concurring opinion Diaz v. Lockheed Electronics, 95 N.M. 28, 618

P.2d 372 (N.M. Ct.App.1980) (J. Sutin, concurring), provides a helpful

description of the defense of "good faith and probable cause."

60.     In Diaz, Judge Sutin specifically discussed "[w]hat is meant by the phrase

'with knowledge that he has no lawful authority to do so'?" Diaz, 95

N.M. at 32, 268 P.2d at 376.

61.     In answer to his question, he explained:

> "Lawful" means "legal, warranted or authorized by law; having
> the qualifications prescribed by law; not contrary to nor
> forbidden by the law." . . . "authority" means "permission." . . .
> "Lawful authority" to do an act means permission to act in a
> manner that is not contrary to nor forbidden by law. "No
> lawful authority" to do an act means no permission to act in a
> manner that is contrary to or forbidden by law . . . . "it is not
> the province of the jury to determine whether or not conduct is
> 'legal' or 'warranted or authorized by law'". . . .Determination
> of these matters is the province of the Court. . . .

Id.

62.     New Mexico cases loosely describe the affirmative defense as "good faith
        and probable cause." Id. at 375; Perea v. Stout, 94 N.M. at 600, 613 P.2d
        at 1039.

63.     This is an affirmative defense on which the defendant bears the burden of
        proof. Diaz, 95 N.M. at 31, 618 P.2d at 375; Perea v. Stout, 94 N.M. at
        600, 613 P.2d at 1039.

64.     "In false imprisonment [cases], it is only necessary for plaintiffs to show
        that they have been restrained of their liberty; the presumption then arises
        that they were unlawfully imprisoned, and it is for the defendants who
        committed the tort to show legal justification therefore. The burden of
        probable cause rests on the defendants. If one seeks to escape liability for
        false imprisonment, he has the burden of proving the justification for his
        action." See Diaz v. Lockheed Electronics, 95 N.M. at 31, 618 P.2d at 375;
        see also Perea v. Stout, 94 N.M. at 600-01, 613 P.2d at 1039-40 (holding
        that "jury [in false imprisonment case against law enforcement officials]
        was [properly] told that 'probable cause' and 'reasonable good-faith
        belief' of lawful authority 'to detain, confine and arrest Plaintiff' were ...
        to be proved by defendants); State v. Johnson, 122 N.M. 696, 701-02, 930
        P.2d 1148, 1153-54 (N.M.1996) ("[A] common-law defense to a civil

11

wrongful arrest or a false imprisonment suit … requires … that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances.").

65.   In false arrest/false imprisonment cases where the defendant is a state law enforcement officer, New Mexico cases focus on whether the officer had authority to exercise his law enforcement duties, whether he believed he had such authority, and whether such belief was reasonable based upon the available facts. Romero v. Sanchez, 119 N.M. at 215-16, 895 P.2d at 693-94 (concluding that police officer was not guilty of false imprisonment because state law authorized him to conserve the peace, he believed detaining the plaintiff was necessary to preserve the peace, and such belief was reasonable based on the facts). This standard is simply a different formulation of the probable cause standard applicable to searches and seizures of persons or things by law enforcement agents. See Ryder v. State, 98 N.M. 316, 319, 648 P.2d 774, 777 (N.M. 1982).

66.   The Court will therefore analyze the actions of the Border Patrol agents in this case under the federal Fourth Amendment standard.

67.   A person is seized within the meaning of the Fourth Amendment when "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Kaupp v. Texas, 123 S.Ct. 1843, 1845-46 (2003)(quoting Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382 (1991)(quoting Michigan v. Chesternut, 486 U.S. 57, 569, 108 S.Ct. 1975 (1988)).

68.   Not all police/citizen encounters constitute seizures within the meaning of the Fourth Amendment, however. The Tenth Circuit in United States v. Muldrow,19 F.3d 1332 (10th Cir.,1994) summarized the Fourth

12

Amendment analysis applicable to "police/citizen encounters" as follows:

> For the purpose of Fourth Amendment analysis, [the Tenth Circuit has] distilled rulings of the United States Supreme Court to define "three categories of police/citizen encounters": "voluntary cooperation ... in response to non-coercive questioning," Terry-type stop, and arrest. [citations omitted].... The standards [for a Terry-type stop] are set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Most courts characterize this as a brief, non-intrusive detention during a frisk for weapons or preliminary questioning.... This is considered a seizure of the person within the meaning of the Fourth Amendment, but need not be supported by probable cause.  In order to justify an investigatory stop, the officer need have only specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. The final category is an arrest which is characterized by highly intrusive or lengthy search or detention. An arrest is justified only when there is probable cause to believe that a person has committed or is committing a crime. [United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir.), cert. denied, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984)].

69.     Courts have consistently held that the Terry exception to the Fourth

        Amendment's probable cause requirement for seizures is a narrow one.

        United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir.), cert. denied, 467

        U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984).

70.     The scope of a Terry stop must be "reasonably related in scope to the

        circumstances which justified the interference in the first place." Terry v.

        Ohio, 392 U.S. at 20, 88 S.Ct. at 1879; United States v. Melendez-Garcia,

        28 F.3d 1046, 1051 (10th Cir. 1994). "This much, however, is clear: an

        investigative detention must be temporary and last no longer than is

        necessary to effectuate the purpose of the stop.  Similarly, the investigative

        methods employed should be the least intrusive means reasonably

        available to verify or dispel the officer's suspicion in a short period of

        time." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325-

        26(1983); United States v. Holt, 229 F.3d 931, 936 (10th Cir. 2000).

71.     In effecting a Terry stop, law enforcement agents are not required to take

13

unnecessary risks.  Agents are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry] stop."  United States v. Melendez-Garcia, 28 F.3d at 1051 (quoting United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)(quoting United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 683-84 (1985))).  The intrusiveness of a Terry stop "will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.

72.    Thus, de minimus intrusions on a person's liberty during a Terry stop, such as frisking for weapons, are allowed for the sake of officer safety.  United States v. Melendez-Garcia, 28 F.3d at 1052.  "However, the use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that 'the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.'"  Id. (quoting United States v. King, 990 F.2d 1552, 1562 (10th Cir. 1993)(quoting Terry, 392 U.S. at 21-22, 88 S.Ct. at 1880)).

73.    Thus, the use of handcuffs or other forceful techniques do not automatically transform a Terry stop into a full custodial arrest but their use must be reasonably warranted by the circumstances.  Id.

74.    Tenth Circuit precedent teaches that the use of forceful techniques (such as handcuffs, firearms, locked cells) during a Terry stop is justified when there is "reasonable, articulable ground[s] for fearing danger from suspects."  United States v. Neff, 300 F.3d 1217, 1221 (10th Cir. 2002); United States v. Melendez-Garcia, 28 F.3d at 1052-1053 (analyzing Tenth Circuit cases in which forceful techniques were justified given police officers' particularized concerns about the defendants).  Inchoate and

generalized suspicions or hunches that an officer may have about a suspect
do not support the use of forceful techniques in a <u>Terry</u> stop to advance
officer safety. <u>Terry v. Ohio</u>, 392 U.S. at 27, 88 S.Ct. at 1883.

75.    Thus, although not all seizures of persons implicate the probable cause
requirement of the Fourth Amendment, when the circumstances
surrounding the seizure are indistinguishable from an arrest, the Fourth
Amendment demands that the law enforcement agent have probable cause
to detain the person. <u>Florida v. Royer</u>, 460 U.S. at 502-03, 103 S.Ct. at
1327 (concluding that probable cause was lacking in detention of a person
that began as "a consensual inquiry in a public place [that] [] escalated into
an investigatory procedure in a police interrogation room, where the
police, unsatisfied with previous explanations, sought to confirm their
suspicions").

76.    "[D]etention for custodial interrogation—regardless of its label—intrudes
so severely on interests protected by the Fourth Amendment  as necessarily
to trigger the traditional safeguards against illegal arrest." <u>Dunaway v.
New York</u>, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258 (1979).

77.    "Probable cause to arrest exists when an officer has learned of facts and
circumstances through reasonably trustworthy information that would lead
a reasonable person to believe that an offense has been or is being
committed by the person arrested." <u>United States v. Vazquez-Pulido</u>, 155
F.3d 1213, 1216 (10th Cir.1998)(citation and quotation omitted).

78.    "Probable cause thus requires a reasonable probability both that there is
criminal conduct afoot and that the particular individual police suspect is
the person engaged in that conduct." <u>United States v. Sparks</u>, 291 F.3d
683, 693 (10th Cir. 2002) (citing <u>Vazquez-Pulido</u>).

79.    It bears mentioning that this is not a case about a person's detention at the

international border or the functional equivalent of the border, and therefore, the special Fourth Amendment considerations applicable to those cases have little bearing on this case. See e.g., United States v. Montoya de Hernandez, 473 U.S. 531, 105 S.Ct. 3304 (1985)(discussing special considerations regarding detentions at the border); United States v. Bravo, 295 F.3d 1002 (9th Cir. 2002)(detention at an international port-of-entry). At the border or its functional equivalent, greater intrusions into a person's liberty are generally allowed because "special rules apply at the border." United States v. Bravo, 295 F.3d at 1009.

80.    Testimony at trial established that Border Patrol agents had reasonable suspicion to stop Plaintiffs and make further inquiries regarding potential alien smuggling.

81.    When BPA Sims stopped Plaintiffs' van, Border Patrol agents knew the following: (1) a car load of undocumented persons was stopped at the Alamogordo checkpoint, (2) Plaintiffs' van had crossed the checkpoint twenty (20) minutes after the load of undocumented persons was stopped, (3) Plaintiff Figueroa shared the same last name with the driver of the car load of undocumented persons, and (4) the ostensible falsity of Plaintiffs' stated purpose of their travel.

82.    When stopped by BPA Sims, Plaintiffs agreed to go to the Alamogordo border patrol station. Plaintiffs' decision, however, does not appear to have been voluntary.

83.    Plaintiffs were separated from each other and a Border Patrol agent escorted Plaintiffs' van to ensure that Silvia would not flee.

84.    Once Plaintiffs arrived at the station, what began as a consensual inquiry quickly turned into "an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to

confirm their suspicions." <u>Florida v. Royer</u>, 460 U.S. at 502-03, 103 S.Ct. at 1327.

85.    Within minutes of arriving at the station, Magdalena was placed in a locked holding cell and Silvia was placed in an interrogation room.

86.    Border Patrol agents read both Plaintiffs their constitutional rights as per a government form.  Then, the agents proceeded to interrogate them.

87.    Less than half hour before Silvia was placed in the interrogation room, Border Patrol agents handcuffed her.

88.    Neither Plaintiff was free to leave although Border Patrol agents "assured" them that they were not under arrest.

89.    Like the defendant in <u>Florida v. Royer, supra</u>, Plaintiffs were placed in a coercive environment (an interrogation room and a locked holding cell), their freedom of movement was severely restricted, they were never advised they were free to leave, and Plaintiffs reasonably believed that they were detained.  No reasonable person would have believed that she is free to leave when handcuffed to a chair or placed in a locked cell.  <u>See</u> <u>United States v. Bravo</u>, 295 F.3d at 1009-1011 (concluding that the defendant's handcuffing for less than 5 minutes was not an arrest and examining case law where handcuffing a person to a bench for more than 4 hours or placing a person in a locked holding cell resulted in an arrest). Indeed, while in <u>Bravo</u>, the defendant was escorted handcuffed to a security office 30-40 yards away and then his handcuffs were removed, here, the agents placed the plaintiffs under arrest by:  (1) handcuffing Silvia to a chair shortly after she arrived and leaving her handcuffed for more than 4 hours and (2) placing Magdalena in a locked holding cell shortly after she arrived at the station.

90.    Moreover, the agents' use of forceful techniques to detain Plaintiffs was

17

not justified under the circumstances. There was no evidence that either Plaintiff presented a threat to the officers.    See e.g., United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568 (1985)(holding that officer's use of a firearm in ordering the defendant to assume "spread eagled" position was justified where the defendant had engaged in dangerous driving maneuvers); Garza v. United States, 881 F.Supp. 1099 (S.D.Tex. 1995)(upholding government's "felony stop tactics" where officers believed the plaintiffs were engaging in evasive driving maneuvers). There was no evidence that guns were found on the Plaintiffs or that officers suspected Plaintiffs were carrying guns or that this investigation was one where firearms were at issue. See e.g., United States v. Perdue, 8 F.3d at 1462-63 (upholding detention where officers drew guns and ordered the defendant to get out of the car because officers learned that guns had been found on the property where the defendant was headed). There also was no evidence that Plaintiffs were seeking to escape custody.

91.    Agents did assure the plaintiffs that they were not under arrest but "[c]ertainly an officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest." Id. at 1011 (citation omitted). The agents' reassurances did not diminish the aggravating influence of the handcuffs especially when agents were forcefully interrogating Silvia and Magdalena and accusing them of being smugglers.

92.    Silvia was handcuffed and Magdalena was locked in a holding cell for simple administrative convenience: male agents did not wish to "pat down" Plaintiffs because they were women and there was no room to hold Plaintiffs. Such justifications, however, do not justify the intrusive measures taken against Plaintiffs.

93.    Based on this evidence, the Court concludes that Plaintiffs were arrested

18

shortly after they arrived at the Alamogordo Border Patrol station. Magdalena was placed under arrest as soon as she was placed in the locked holding cell; Silvia was placed under arrest at approximately 7:45 p.m., approximately twenty minutes after she arrived at the station.

94.   More than an hour after Plaintiffs arrived at the station, at approximately 8:35 p.m., Border Patrol agents learned the following facts: (1) the driver of the car load of undocumented persons had a Chicago address that was near Plaintiffs' home address and (2) one of the undocumented passengers carried a piece of paper with the same phone number which was provided by Plaintiffs as the relative they were staying with in El Paso and that was also on a piece paper in Plaintiffs' van.

95.   This piece of information, however, does not establish probable cause to detain Plaintiffs. The Chicago addresses do not establish that Plaintiffs and the driver were conspirators in alien smuggling; and, the telephone number links Plaintiffs to someone who was unknown to the agents and about whom little was known. Neither the driver nor the undocumented passengers ever implicate Plaintiffs as being involved in the smuggling scheme.

96.   The Court's opinion that no probable cause exists with this additional information is reinforced by the agents' own perception of the investigation. They also were not of the belief that Plaintiffs had committed a crime.

97.   Much later in the evening, sometime before Plaintiffs were released, Border Patrol agents learned that a vehicle had been seized from Silvia for unknown reasons. This additional piece of evidence does not appear to furnish the necessary proof for probable cause. The agents had no knowledge regarding why the vehicle was seized (drugs as opposed to

smuggling). In any event, by this time, Plaintiffs had been in detention for more than 3 hours.

98.    The Court also finds that Border Patrol agents did not have a "good faith" belief that they could detain Plaintiffs under such coercive circumstances. This finding is supported by the agents' belief that Plaintiffs did not pose a threat to the officers, that they did not believe they had probable cause to arrest Plaintiffs, and their "assurances" to Plaintiffs that there was no arrest.

99.    As a result of Defendant's actions, Plaintiffs were deprived of their liberty for over 3 hours. Additionally, the Court finds that Plaintiffs suffered fear, anxiety, humiliation, and negative impact on their general mood.

100.   Silvia was forced to withdraw from school as a result of this traumatic experience. She also experienced significant weight loss and gain.

101.   The Court finds the testimony of Grace Gianforte credible. Ms. Gianforte treated Silvia for several weeks and her observations confirm Silvia's mental damages.

102.   Magdalena suffered from anxiety and humiliation and she was afflicted with migraine headaches.

103.   These symptoms were pronounced for at least 6 months after they were falsely arrested.

104.   The Court finds by a preponderance of the evidence that Plaintiffs met their burden of showing that, under New Mexico law, Defendant falsely arrested and/or imprisoned Plaintiffs.

105.   Under New Mexico law, Plaintiffs are entitled to recover damages for their false imprisonment. See e.g., Stienbaugh v. Payless Drug Store, Inc., 75 N.M. 118, 401 P.2d 104 (N.M. 1965).

106.   Once a plaintiff establishes his right to recovery, he must be fully

compensated to insure that he is in as good position as if the harm or injury had never occurred. Cent. Sec. & Alarm Co., Inc., v. Mehler, 918 P.2d 1340,1348 (N.M. Ct.App. 1996).

107.   New Mexico cases has few reported cases on false arrest and those where the plaintiff was victorious are more than 10 years old.

108.   The Court has reviewed damages awards in other similar cases, see e.g., Engle v. Mecke, 24 F.3d 133 (10th Cir. 1994)(in a Bivens and FTCA lawsuit for assault and battery, jury awarded $351,646.00 against individual officer and court awarded $28,300 against the United States in an FTCA case); Kennedy v. Dexter Consolidated Schools, 129 N.M. 436, 10 P.3d 115 (N.M. 2000)(in § 1983 civil rights suit where students were asked to strip search, jury awarded $50,000 to each plaintiff for compensatory damages); O'Neal v. Ferguson Construction Company, 237 F.3d 1248 (10th Cir. 2001)(in § 1981 case for racial discrimination, jury awarded $302,721.25 in compensatory damages).

109.   There is no set price placed on the value of the freedom of U.S. citizens and lawful residents who are unjustifiably deprived of their liberty.

110.   Because of Plaintiffs' injuries suffered as a result of Defendant having falsely imprisoned them on August 4, 1999, Plaintiffs are entitled to compensatory damages in the amount of $200,000 each.

Accordingly, **THE COURT CONCLUDES AS A MATTER OF LAW** that Plaintiffs have met their burden of showing by a preponderance of the evidence that Defendant false imprisoned/arrested them.

**THE COURT FURTHER CONCLUDES AS A MATTER OF LAW** that as a result of Defendant's actions, Plaintiffs have suffered damages in the amount of $200,000 each.

**THE COURT FINALLY CONCLUDES AS A MATTER OF LAW** that

Plaintiff is entitled to post-judgment interest at a rate equal to the weekly average 1-year

constant maturity Treasury yield for the calendar week ending March 19, 2004, which is

__ percent.

Respectfully submitted,

MARY STILLINGER (local counsel)
New Mexico Bar No. 4530
701 N. St. Vrain
El Paso, Texas  79902
Phone: (915) 544-0415
Fax: (915) 534-7207

JAVIER N. MALDONADO
Texas Bar No. 00794216
DAVID A. ARMENDARIZ
Texas Bar No. 24031708
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW OF TEXAS
118 Broadway, Suite 502
San Antonio, TX 78205
Phone: 210-277-1603
Fax: 210-225-3958

JASON DAVIS
Texas Bar No. 00793592
Law Office of Jason Davis, P.C.
5945 Broadway
San Antonio, TX  78209
Phone:  (210) 930-4611
Fax:     (210) 930-3815

LYNN COYLE
Illinois Bar No. 06204053
521 Texas Avenue
El Paso, TX 79901

phone: (915) 532-5544
fax:     (915) 532-5566

BY:

LYNN COYLE
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that on March 1, 2004, a copy of the foregoing document was sent via

U.S. regular mail to the following:

        Cynthia L. Weisman
        Assistant U.S. Attorney
        P.O. Box 607
        Albuquerque, NM   87103

                                Lynn Coyle